We'll call the next case. Bruce M. Dolfman, Administrative Estate of Lee, Zen, Deceased v. Cedar Fair, et al. Mr. Weidemar, it's been a while since it has been, Your Honor, and it's a privilege to appear in this court for my first time today. Thank you. May I introduce my co-counsel, Caroline Reeves, and may I, with permission of the court, reserve five minutes for a rebuttal. That request will be granted. The trial court's gatekeeper role and its duties when it's asked to adjudicate summary judgment motions are clearly defined and described by this circuit's jurisprudence. But in this case, the district court chose to ignore the vast majority of appellant's evidence, including two unchallenged comprehensive expert reports, 92 exhibits that included extensive deposition testimony, many records from the appellees developed during discovery, and an affidavit from a young woman from China who was a co-participant who lived and worked in China. How is it that you contend that defendants proximately caused the death of this young woman? But I get back to the issue of proximate causation. I mean, there may have been some role here, but for causation, if you will. But I'm more interested in how there is proximate causation of this accident. Well, their knowledge of J-1s walking day and night on Hamilton Boulevard, because we know that Cedar Fair as the employer placed J-1s, we call the participants J-1 visa holders. They placed them for a number of years at the Comfort Suites Hotel. But they had options here as to types of transportation to use and whether to walk, taxi cabs. I mean, this young woman had a substantial amount of money in her pocket. She could have used a taxi. So when there are other options that really are intervening here, how can we find that there was proximate causation? Well, let me raise that because certainly the availability of transportation, whether it was a bus, the hotel courtesy van, taxis, were a matter that was a part of the summary judgment motion. And we provided a great deal of evidence. Number one, to dispute the availability of that transportation. And number two, to dispute... There were no taxis available? At 530 in the morning, there may have been water. But we submitted a court and argued to the lower court that that's a genuine dispute of material fact. But in this case, the district court chose to... Well, in order to make it a dispute, wouldn't you have to say that there... have some evidence that there were no taxis available? We believe not. And in fact, in the district court's opinion, unsupported by any evidence, it was honored Judge Diamond found that the decedent chose not to take a taxi. That is just not in the record. Well, his ruling is that no reasonable jury could find that the conduct of the defendant proximately caused or owed a duty such that a jury could find that there's liability here. But the point is that you're not arguing that there's a strict liability by the defendant on the defendant's part, are you, sir? That's correct, Your Honor. You're not arguing a strict liability. So that anywhere you go, for all of us, not only for a visiting stranger from a country, there is some danger to life. You just can't avoid it, wherever you're placed. Is that correct? That's correct, Your Honor. All right, well, if that's correct, so that... the question is, did they place her in a setting which a reasonable person could say, look, this is such a dangerous location that no... that a reasonable jury could conclude that she was proximately injured by a... by a cause that the defendants should have been aware of and they had a duty to prevent that from happening. What is wrong with the... the judge said no, that they did not place her in such a dangerous situation and that a jury could not say as a matter of law, he said, that no jury could reasonably conclude that that was a dangerous situation that they placed her in. That is what the lower court did, Your Honor. And we believe that the lower court went from the bench as gatekeeper and went into the jury box as fact finder. And I say that because the lower court made credibility determinations, it weighed evidence, it... Well, I'm not aware that the court weighed evidence to make credibility, I'm aware that the court looked at expert reports and so forth, but looking at everything, the court said no reasonable jury could come to the conclusion that the situation they placed her in was such that a reasonable jury could find that they had a duty not to do that and that breach of duty proximately caused her injury. What's wrong with that thinking that the district court ruled on this as a matter of law? Your Honor, number one, and the lower court did consider the goals and the purpose of the Fulbright-Heinz Act, but it ignored... it ignored our expert reports, it ignored all of our evidence. You make that point, and on its face it seems to have some validity, except when you look at what was ignored. And you talk about here that your opposition has said that the expert reports were unreliable and inadmissible. Let's talk about inadmissible for a second. Didn't your experts, in essence, opine and give an expert opinion on the ultimate question, ultimate legal question of proximate cause? Isn't that what they did? There is no question that that's what they did. Okay, and haven't we said in the case of Berkeley Investment Group v. Colquitt that that is not a proper role for an expert witness? Haven't we said that? Your Honor, ten years ago your Honor issued that opinion, and I'm familiar with that opinion. So how do you distinguish that opinion? I'm sorry? How do you distinguish that opinion? Your Honor, actually we believe that, and the lower court cited that opinion, we believe that it stands for the proposition of it's shut up, it's put up a shut up time for counsel representing the non-moving party. And what we did was submit this evidence, and what the trial court did not do was explain in its opinion why it did not consider our expert reports. Which did, and it happens in every or most personal injury cases, wrongful death cases, where there is expert testimony. If you're correct, and they didn't also, the district court didn't also explain why it didn't consider the items that you've outlined in your reply brief, but what do we do with this? Does this mean it goes to a jury, or do we send it back to the district court to more fully explain their decision on summary judgment? Your Honor, number one, we believe that regarding CCUSA's challenge for the first time regarding expert reports and qualifications, that they have waived that opportunity to challenge it. That's number one. Number two, we strongly and respectfully submit to the court that because the district judge, his Honor, Judge Diamond, did not consider these expert reports, that the matter is settled. The matter is what? The admissibility, at least for purposes of Dahlberg, has been decided. It's been waived. It was not decided by the court, it was not addressed by the attorneys. But we have de novo review on the question of whether or not summary judgment was appropriately granted. Can't we just look at all this and make a determination ourself? Well, under de novo review, you certainly can, Your Honor, but under Dahlberg, the proponents of expert reports have the opportunity to put on their evidence in support of those experts. The party opposing the experts have the opportunity to challenge qualifications, reliability, and fit, and none of that happened. The district court did look at the expert reports. That was part of the consideration of the grant. He did examine them now. There's no question about that. But there is. His Honor, Judge Diamond, did not. And the jurisprudence in this circuit is very clear about this. But he said even after considering them, there's still no question there's a duty owing here or approximate cause here. But more than that, and you've made quite an issue of the alternative means of transportation. Even if there was no transportation available at 5.30 a.m., how would that constitute a breach of duty owed to the plaintiff? I mean, none of us have 24-hour transportation everywhere we want to go. So how would that in and of itself make this a case as a jury-wise? Your Honor, the goals and purposes of this act, of the federal regulations, and this may be the first case to really address 22 CFR 6232. Those goals and purposes established a special relationship. But you're saying we have to have 24-hour transportation availability under this act because they owe that duty if they have it as a resident. We're not saying that the appellants have a duty to provide 24-hour transportation. We said that they have a duty. Don't place participants in a hotel that's staying on a dangerous highway knowing that these J1 participants routinely, day and night, walk on that highway. But you're making them be insurers, if you will. Pardon me, Your Honor? You might ruin the program because any opinion along those lines is making people in the position of defendants insurers of anything that happens to these participants. To some extent, that is absolutely correct, Your Honor, because under the regulations the state sponsors are also required to take more active roles in ensuring that the participants have access to suitable, affordable and safe housing. So yes, to some extent, because of this special relationship and the higher standard, higher duty of care owed to the participants in the seating, yes. So you're saying this is unsafe housing? Unsafe. Well, there are an awful lot of comfort suites along very, very busy highways. Unsafe or unsuitable? Both, Your Honor, because the regulations say suitable and acceptable. So this court is faced with the challenge of whether or not to use these facts to defend. Okay. Judge Collin. Well, Judge Randall asked a question that I already had. At bottom, your entire case is based on the fact that you say that the housing they gave you was unsafe housing. That's exactly right. That's the bottom of your point. That's exactly right. Thank you, sir. Okay. Thank you. We'll have you back on rebuttal. Mr. D'Amico? Yes. Good morning, Your Honor. Counsel. May it please the Court, my name is Joseph D'Amico. I'm here on behalf of the Appalachia Cedar Fair, more commonly known in this area as Dorney Park and Wildwater Kingdom. And I welcome the opportunity to discuss the facts at length that the Court wishes. We understand. We understand the facts. The facts are fairly straightforward. The facts are simple. This young woman, obviously, at 5.30 in the morning, for whatever reason, decided to walk down Hamilton Boulevard, which, by the way, is absolutely legal to do. Well, they placed her in an unsafe place where she had that. That was the consequence, by reason of the placement, which they gave her. And clearly, Judge Diamond considered that question. He actually went further than we had argued and found that there was a duty to determine whether or not that was suitable housing. There's absolutely nothing wrong with the hotel. The hotel had nothing to do with the accident. She's walking almost a mile away. It's the placement of the hotel. No one's blaming the hotel. It's the placement. Your adversary says housing they gave this foreign student was unsafe given the circumstances of her employment. It's unsafe because it's served by two taxi cab services. It's unsafe because it has the public transportation bus stop literally at the end of the driveway, eastbound, and across the street, westbound. Not at 5 o'clock in the morning, whenever she left. That's right. At 5.30 in the morning, somebody has to make a decision. And this young woman, who was an experienced traveler, internationally, on her own, as a young adult, and an experienced traveler on her own in a very large country called China. So maybe you have contributory negligence. But should it go to the jury to decide to what extent she was responsible versus the Dorney Park and the counselors? Absolutely not, Your Honor, because of the question you raised at the very beginning of the argument, the issue of proximate causation. As a legal cause, where is the line drawn? And clearly, there is nothing here identifying a defect, an unsuitability of this hotel, other than the fact people have free will, and they may decide to take actions that they wish to take. Now, Mr. Domenico, isn't really the question of whether or not the duty, let's assume for a second that your client, Cedar Fair, had a duty under the regulations to provide safe and suitable housing. Isn't the question of whether or not that duty was breached, isn't that a question for the jury? No, Your Honor, because of the issue of proximate causation, the gatekeeper role that Judge Diamond and Counsel Mr. Wiedemann referred to, where, as a matter of public policy, is the line drawn? And this is so attenuated. We're supposed to know that this young woman is going to decide at 5.30 on a rainy Tuesday morning to walk along Hamilton Boulevard, which was absolutely legal to do, and we're supposed to assume that a young man named Zachary Edwards was going to be driving in contravention of his driver's license, which restricted him to daylight hours, and assume that he would not see this young woman crossing an on-ramp to I-78, even though, according to their very own expert, there was a clear path of vision, and this young woman with a clear path of vision would not see this car coming. Let me read this statement to you from Pennsylvania law. It says, Breach of Duty is generally a question for the jury, but summary judgment is warranted when the case is free from doubt and there is no possibility that a reasonable jury could find negligence. And that's exactly what the judge did here. So you think that that standard is met here with these facts? Absolutely. Free from doubt and no possibility. Especially when you consider that when we deposed the parents, they clearly knew that their daughter traveled independently all the time, and when asked why she got to make her own decisions. Somehow we're supposed to have a higher duty of care than her parents when she was a student. This is a young woman who graduated with a dual degree from Tangier University and University of Quebec. She spoke English and understood English very well. She traveled internationally. She liked to travel. She was on a program where part of the intent was to travel, and evidently on this day at 5.30 in the morning, she's going somewhere. Well, whether duty was breached or not, as Judge Fischer has indicated, overwhelmingly under the law, maybe not proximate cause. That could be a question of law. But whether or not there's a duty is always a jury question under very limited circumstances. Maybe not, but whether there's a duty only under the facts of the case. And the judge decided this as there being no duty, and he didn't even mention in his opinion the experts. Who was it? Costa and a second expert, I think it was named. The one of the – That's who it said, Costa. And those reports certainly spelled out that this was an unsafe housing based on the fact that this was not something suitable for a foreign student to live in because the transportation was very limited here at certain hours of the day. Transportation is limited probably everywhere at certain hours of the day, even in a city like Philadelphia. Sometimes you may have to wait for the tax attorney. Why are you making that argument to a jury instead of to a three-judge panel? No, because, Your Honor, I would submit to you that the actual determination whether a duty exists on the gatekeeper level is a matter of public policy. And as a matter of public policy, would it make any sense to try to impose liability under scenarios like this? You had these regulations here. You had 6232, which was specifically adopted for situations like this, for host employers and for people like CCUSA. It seems to me that actually Judge Diamond said that your client owed a duty of care to Ms. Zinn, but they had no duty to warn her of obvious dangers, which sort of parses the question a bit, but it goes back to my initial question. It's hard to enough factual uncertainties here that this should have been a jury question. Absolutely not, and you're correct. Judge Diamond, I think, would further re-argue that from the inception there was no duty as it relates to this accident because we're looking at doing the accident. And Judge Diamond giving plaintiffs the benefit of the doubt found, okay, there's a duty related to the housing, but looking at this housing, looking at what's available, how is this unsuitable? But more importantly, how does that cause the events at 530 in the morning? The plaintiff had two expert reports saying it was unsuitable. Yes. And if it went to a jury, you know, a jury may disagree with the plaintiff, but they say, yes, this was unsuitable housing given the island that this was in, a segregated area almost, and transportation was not readily available. Well. A jury may, look, this would, you and I may have one. I understand that. But why is it so unreasonable for a jury to conclude that way if they want to? They may disagree with you or me or anyone else. There's certainly no island. You'd have to ignore the facts to say that there's an island. It's a hotel on Hamilton Boulevard in Allentown with two churches and a Toll Brothers residential neighborhood behind it. With very, very little public transportation in Allentown, most people there are suburban automobile commuters. There's not a lot of public transportation. It's not like Philadelphia and other big cities. So you're housing in an area where it's really a suburban area where most people go by car, not a lot of public transportation. I rode bicycle on my daughter's road to Thornton Park for work. What evidence was there in the record as to the availability of alternatives to walking? Okay. In addition to the testimony from Sharon Dickinson, she's the former general manager of the hotel, she talked about the shuttle van service and all the details about that and the information available to other guests. But what was the evidence that there was available other alternatives at that hour? Okay. At that hour? Yes. Other than the information regarding taxi service in the hotel catalog, rather than common sense that there were taxis that come to the hotel. So there was no evidence that there wasn't taxi service. Is that correct? Clearly there was no evidence that there wasn't taxi service. So Ms. Dickinson testified that the taxi services would service the hotel 24 hours in her experience. And she is the general manager of the hotel. Who is that? Sharon Dickinson. Sharon Dickinson also testified that there was no guarantee that the hotel's courtesy van would be available. If you made arrangements, they would certainly try to accommodate you. It was available 7 a.m. to 10 p.m. That's right. We've all gone through that. If you're trying to get somewhere early, it may not be. Can you help me out? She said we could certainly do that. She also testified that the J-1 students or J-1 employees, whatever you wish to call them, utilized the hotel courtesy van on occasion. So it was available. But what it comes down to is this young woman decided she wanted to walk. And she decided she wanted to walk the shortest route, a lawful route, a route that has bus stops along the way, rather than going the route through the neighborhood. Okay. Those are not in dispute. And that's why when you ask about the expert reports, Judge Steinick can consider them. He doesn't have to do a point-by-point rebuttal on every piece of evidence somebody tries to throw out to see what sticks and what doesn't stick. The facts themselves are really not in dispute. And when you review those facts, it becomes pretty clear that there's not an issue of proximate causation. And that is why Cedar Fair and, in fact, CCUSA is entitled to some of the judges. Okay. Thank you. Domenico, thank you very much. And we'll hear from Mr. Morgenstern. Thank you, Your Honor. I'm John Morgenstern. I represent Camp Counselors USA, or as they're commonly referred to in this case, CCUSA. CCUSA is a designated sponsor in the J-1 visa program and had placed Ms. Zhen with Cedar Fair. So they're the program sponsors? Yes, sir. And they had perhaps a different, maybe broader duty to a J-1 such as Ms. Zhen in that they had a duty to orient Ms. Zhen to not just the country, but to the area in which she was being placed, correct? Yes, sir. Okay. So was there adequate orientation as to the right-of-ways of passengers versus automobiles in this country? Your Honor, there was more than adequate orientation that was provided in China. As this orientation is provided under the J-1 visa program, it's provided in the native nation of the participating program participant. In this case, there was a sizable handbook as well that was provided to every participant. Now wasn't there something that pointed out the law under the Pennsylvania Motor Vehicle Code that a pedestrian had the right-of-way? Your Honor, there was a section on transportation that encouraged participants to use public transportation as well as private forms of transportation and indicated that you may need to drive. And if you were operating a motor vehicle in the United States, you must watch out for pedestrians. But the specific statement that Judge Fischer made, isn't that correct? Pedestrians have the right-of-way? Your Honor, it does say that pedestrians will have the right-of-way, which is an accurate statement of both Chinese and Pennsylvania law. So what is reasonable for one to believe from that statement? It is reasonable to believe exactly the black letter of the words that pedestrians have the right-of-way. I think I know this intersection where this young lady was struck. I don't know that I can ever say I was there at 5.30 in the morning. I doubt that I was. But she ran across it. I definitely did run across it. But it was dark. It's not that wide. But cars could come relatively quickly into that. But wasn't it reasonable for her to think, based on what she was told, that if she tried to cross that narrow entrance ramp, that cars would stop for her? No, Your Honor, absolutely not. And no reasonable jury could ever find that an individual would think reasonably that she could cross an on-ramp onto a major interstate highway and that cars would have an obligation to stop when she's not in a crosswalk and that she had no duty to watch out for her. There wouldn't be any crosswalks there. As I understand this, she was crossing, attempting to cross, we don't have her testimony, obviously, but she was attempting to cross this entrance ramp to get to the other side to continue walking on the Hamilton Boulevard. Correct? At that point, Your Honor, I'm not sure if Hamilton Boulevard continued on the other side or if she was moving over to the bus terminal at that point. There was a reason to get across that entrance ramp. Yes, sir. Well, no one is saying that what she did here was the brightest thing in the world. Even assume that she was negligent. But that doesn't mean that they placed her in a setting which a reasonable jury could find was unsafe. I mean, who are you or I or any court to say that? Is that a jury question? It's not a jury question, Your Honor. Where CCUSA's duty begins and ends is in the orientation process. And CCUSA, which is based near San Francisco in California, their obligation was to provide the orientation and to ensure suitable housing would be provided by the employers. In this case, suitable housing was provided. Well, that's the question. As I say, you say it as if it's a fact. We don't know. That's the question for resolution. Was suitable housing provided? And, you know, the judge decided this as a lack of duty on summary judgment. My experience, as Judge Fischer mentioned, is that on very unusual circumstances, it's a question of law. But usually, overwhelmingly, it's a question of fact. And I'm not saying I agree or disagree with the expert reports. But if you buy the expert reports, this accident was almost foreordained. I'm not saying I buy it or don't. But is that a jury question? And should your argument be made to 12 true citizens as to whether or not you breached the duty by allowing her to be housed here? No, Your Honor. Again, no reasonable jury could find that any duty owed to Ms. Jen or any other J-1 participant was breached causing this accident. Even though the argument would be that, look, they housed her in an island in the middle of nowhere with all the transportation available, limited times under certain circumstances, and she wanted to get to see the culture and the people of the country, and it was promised to her it would be available, and it was available at the risk of great injury. And, Your Honor, the point is that it was not in the middle of nowhere. It was next to an interstate highway three-quarters of a mile away from a bus terminal across the street from her employer. In this case, it's the word suitable housing. The J-1 sponsor is to ensure suitable housing that would be provided through the employer. In this case, the argument, I believe, by the appellant is that the housing was not suitable because it was unsafe. It was unsafe because Hamilton Boulevard was there. That might be more appropriate to Cedar Fair. But the question, I think, is to your client. It's more on the orientation. You rise and fall on the suitable housing as where the court looked at Cedar Fair's role and Cedar Fair's duty, but I think that the orientation, you want to ignore that by saying, well, we put the handbook on it. But the duty to properly orient may go beyond the suitable housing question. Well, Your Honor, but there would be no causation in any event on the part of CCUSA. You would have to go through Cedar Fair and first establish that the comfort suite was unsuitable housing for some reason before the I'm not sure about that. That's your argument. That's a good argument, but I say I'm not sure that it's that limited. I'd like to point out to you, Your Honor, that the suitability of the housing would have to entail some unsafe condition. You say that's the key. If we find that the housing was suitable and there was no breach of that duty to provide suitable housing, case is over. As to CCUSA, most certainly, Your Honor. Okay. I see that my time is up. Okay. All right. Thank you. We'll have Mr. Wiedemer back on rebuttal. Mr. Wiedemer, is he correct on that? Sorry, Your Honor. Is he correct on that as if we find that the housing is suitable and it was safe that the case is over? That is one of the core issues, of course, that faced the lower court. But suitable housing and CCUSA's duty to decedent is more than just providing orientation. It's to monitor the course of the participant's time during the summer when they're actually working and traveling according to the Fulbright-Hayes Act. And it's our position that CCUSA, in partnership, and that's what the Act calls. What should they have done? You're saying they're supposed to monitor. What should they have done? They should have told Cedar Fair it's dangerous to put these J1s in this hotel knowing that they walk on this dangerous highway.  Sorry, Your Honor. Do we have, were there accidents all the time? Do we have any data in the record that says this place, you know, there were accidents all the time. People had to walk across the street unsafely. I mean, what do we have other than this particular accident as evidence that it was unsafe? There is none of that type of evidence in the record, Your Honor. But, again, and I ask the question. Well, don't you think there should be? I mean, we can't just say, oh, this happened to her, therefore this is unsafe. You're making a broad, and you're saying that they had a duty to know that this was unsafe. They had to realize that this was not appropriate housing. What is there in the record that would lead someone to believe that, I mean, are there accidents? Does this happen all the time? Do we know? Your Honor, the only evidence in the record was a panelist's two unchallenged expert reports on the issue of duty and breach of duty and causation. Well, they kind of put the rabbit in the hat, as I think Judge Fisher points out. You know, they decide the ultimate issue. The hotel was, in the local geographic context, unsafe housing because it forced J-1 participant workers who lived there to walk on Hamilton Boulevard. Well, that's, you know, that's putting the rabbit in the hat. It is very strong, Your Honor, but it is the facts that we have in this case regarding, and even a panelist's expert admitted that J-1s were all from foreign countries. But did we have eight of them testify that this was unsafe? Do we have any other evidence? That's what I'm asking. Your Honor, even CCUSA's representative, Theresa Coderre, and I did the deposition when I asked her, do you think it's safe to walk on Hamilton Boulevard? And without hesitation, she said, I won't walk on Hamilton Boulevard. Okay. So it is dangerous, and they knew it was dangerous. Well, it's dangerous to walk on Hamilton Boulevard, but that's not the issue. The issue isn't whether it's dangerous to walk on Hamilton Boulevard. The issue is whether putting someone in a hotel that is located where this is located is. That is absolutely correct, Your Honor. And I want to point out, Your Honor, that CCUSA's argument regarding contributory negligence and its comment at page six of its brief, and its characterization of decedent as a babe in the woods, that may play to a jury, but it has no place in this court. Contributory, and this is well established now, contributory negligence is not a matter to be resolved or decided at the summary judgment level. Isn't it a potential factor, isn't that same conduct a factor in evaluating whether or not there's proximate causation? Yes, Your Honor, it is. But in light of or in consideration at the summary judgment level of all of appellant's evidence and appellant's duty to establish genuine facts, genuine disputes of material facts, we say that we met our burden, and that the dispute was resolved.